UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

CHARLES McDONALD,
        Plaintiff,                                   CIVIL ACTION NO. 12-12077

        v.                                        DISTRICT JUDGE BERNARD A. FRIEDMAN

                                                         MAGISTRATE JUDGE MARK A. RANDON

COMMISSIONER OF
SOCIAL SECURITY,
        Defendant.
_____/

**REPORT AND RECOMMENDATION
ON CROSS-MOTIONS FOR SUMMARY JUDGMENT (DKT. NOS. 12, 14)**

        Plaintiff Charles McDonald challenges the Commissioner of Social Security's ("Defendant") final denial of his benefits application. Cross motions for summary judgment are pending (Dkt. Nos. 12, 14). Judge Denise Page Hood referred the motions to this Magistrate Judge for a Report and Recommendation (Dkt. No. 2). The case was subsequently reassigned to Judge Bernard A. Friedman (Dkt. No. 15).

**I.    RECOMMENDATION**

        Because substantial evidence supports the Administrative Law Judge's ("ALJ") decision that Plaintiff was not disabled between October of 2003 and February of 2005, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

**II.    DISCUSSION**

        *A.    Framework for Disability Determinations*

        Under the Social Security Act, (the "Act") Disability Insurance Benefits and Supplemental Security Income are available only for those who have a "disability." *See Colvin*

*v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). The Act defines "disability," in relevant part, as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment, which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months. 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One: If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.
>
> Step Two: If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three: If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education, or work experience.
>
> Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

*See* 20 C.F.R. §§ 404.1520, 416.920; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "The burden of proof is on the claimant throughout the first four steps . . . . If the analysis reaches the fifth step without a finding that the claimant is disabled, the burden transfers to the [Commissioner]." *Preslar v. Sec'y of HHS*, 14 F.3d 1107, 1110 (6th Cir. 1994).

### B.   *Standard of Review*

This Court has jurisdiction to review the Commissioner's final administrative decision

pursuant to 42 U.S.C. § 405(g).  Judicial review under this statute is limited such that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record."  *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (internal quotation marks omitted); *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 654 (6th Cir. 2009) ("[I]f an agency has failed to adhere to its own procedures, we will not remand for further administrative proceedings unless the claimant has been prejudiced on the merits or deprived of substantial rights because of the agency's procedural lapses") (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted); *see also Cutlip v. Sec'y of HHS*, 25 F.3d 284, 286 (6th Cir. 1994) (internal citations omitted) (explaining that if the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion"); *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (noting that the substantial evidence standard "presupposes . . . a zone of choice within which the decisionmakers can go either way, without interference by the courts" (internal quotation marks omitted)).

When reviewing the Commissioner's factual findings for substantial evidence, this Court is limited to an examination of the record and must consider that record as a whole.  *See Bass v. McMahon*, 499 F.3d 506, 512-13 (6th Cir. 2007); *Wyatt v. Sec'y of HHS*, 974 F.2d 680, 683 (6th Cir. 1992). The Court "may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council."  *Heston*, 245 F.3d at 535.  There is no requirement, however, that either the ALJ or this Court discuss every piece of evidence in the administrative record.  *See*

*Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party") (internal quotation marks omitted).  Further, this Court does "not try the case de novo, resolve conflicts in evidence, or decide questions of credibility." *Bass*, 499 F.3d at 509; *Rogers*, 486 F.3d at 247 ("It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant").

### III.   REPORT

#### A.   *Administrative Proceedings*

Plaintiff applied for disability and disability insurance benefits on July 11, 2005 and supplemental security income benefits on July 20, 2005.  On both applications, Plaintiff alleged he became disabled on October 31, 2003 (Tr. 12).  After the Commissioner initially denied Plaintiff's application, he appeared with counsel for a hearing before ALJ Roy L. Roulhac, who considered the case *de novo*.  In a written decision, the ALJ found Plaintiff was not disabled (Tr. 12-19).  Plaintiff requested an Appeals Council review (Tr. 6).  On August 15, 2008, the ALJ's decision became the final decision of the Commissioner when the Appeals Council declined further review (Tr. 3-5).

Plaintiff filed a lawsuit on October 10, 2008 (Civil Action No. 08-14329; Dkt. No. 1).  On February 8, 2010, District Judge Bernard A. Friedman remanded the case for the ALJ to consider Plaintiff's severe venous stasis[1] between October 31, 2003 and February of 2005 (Civil Action No. 08-14329; Dkt. No. 26).

---

[1] Venous stasis is "a disorder in which the normal flow of blood through a vein is slowed or halted."  *See* http://medical-dictionary.thefreedictionary.com/venous+stasis (last visited May 21, 2013).

On remand, the ALJ again found Plaintiff was not disabled (Tr. 322-332). Plaintiff requested an Appeals Council review (Tr. 317-318). On March 1, 2012, the Appeals Council declined further review (Tr. 312). This suit followed.

### B.     *ALJ Findings*

Plaintiff was 52 years old on his hearing date in November of 2010 (Tr. 499). He has a ninth grade education and past relevant work as a tire servicer, machine operator, production assembler and short order cook (Tr. 330, 499). The ALJ applied the five-step disability analysis to Plaintiff's claim and found at step one that he had not engaged in substantial gainful activity since his disability onset date in October of 2003 (Tr. 325).

At step two, the ALJ found that Plaintiff had the following "severe" impairments: chronic venous stasis, hyperlipidemia, hypertension, gastroesophageal reflux disease (GERD), and lower back pain (Tr. 325).

At step three, the ALJ found no evidence that Plaintiff's impairments met or medically equaled one of the listings in the regulations (Tr. 325).

Between steps three and four, the ALJ found that Plaintiff had the Residual Functional Capacity ("RFC") to perform:

> sedentary work . . . except: [Plaintiff] requires a sit/stand option; can perform no pushing and/or pulling with the left lower extremity, and no more than occasional climbing of ladders and steps, balancing, stooping, kneeling, crouching, and crawling; should have no exposure to unprotected heights, chemicals, vibrating tools, moving machinery, dust, fumes, and gases; and was limited to simple tasks.

(Tr. 325).

At step four, the ALJ found that Plaintiff could not perform his past relevant work as a tire servicer, machine operator, production assembler or short order cook (Tr. 330).

At step five, the ALJ found Plaintiff was not disabled, because there are a significant number of jobs available in the national economy that Plaintiff could perform (Tr. 331).

  *C.*  *Administrative Record*

    **1.**  **Plaintiff's Hearing Testimony and Statements**

Plaintiff testified that he has had lesions on his feet since 1998 (Tr. 501). He stopped working in October of 2003, because an ulcer opened up on his leg (Tr. 503-504). Between October of 2003 and February of 2005, Plaintiff had calluses on his feet and periodically used crutches (Tr. 501-502). He recalled that, in 2004, his calluses prevented him from wearing shoes every other month, and he did not leave the house (Tr. 502-503). Plaintiff could wear shoes in 2005, but he experienced swelling in his feet, ankles and legs (Tr. 503). Plaintiff's legs stopped swelling in February of 2005 when he began taking blood pressure medication (Tr. 505).

Between October of 2003 and February of 2005, Plaintiff testified that he did not participate in any activities, cook or iron (although, he previously testified to volunteering at a retail shop once or twice a month) (Tr. 297, 507-508). According to Plaintiff, he had to wear compression stockings[2] and elevate his feet every day for almost the entire day (Tr. 509-510).

    **2.**  **Medical Evidence**

---

[2] "Compression stockings are special socks that improve blood flow in the leg veins and prevent blood from pooling in the legs. They are woven in a special way so that they are tighter near the feet and gradually become looser as they go up the leg. This steady squeezing of the legs helps blood flow out of the leg veins and back towards the heart. By improving circulation in the veins of the legs, compression stockings can prevent blood clots (deep vein thrombosis) and relieve the symptoms of chronic vein disease and varicose veins, such as swelling, aching, and pain." *See* http://www.hearthealthywomen.org/treatment-and-recovery/pvd-treatment and recovery/compression-stockings/html (last visited May 21, 2013).

Because Plaintiff seeks benefits for the period between October of 2003 and February of 2005 for his chronic venous stasis, this Magistrate Judge only considers the medical evidence regarding this condition (pages 87-133 of the record).

On March 19, 2003, Plaintiff visited a doctor at the U.S. Department of Veterans Affairs ("VA") hospital with complaints of pain in his left foot and left leg with dry skin, scarring, redness, and hotness with color changes (Tr. 111). Plaintiff was diagnosed with left leg cellulitis[3] (Tr. 111). The following day, it was determined that the source of the infection might have been due to the skin over the inner surface of Plaintiff's left ankle being dry and cracked (Tr. 110).

On April 4, 2003, it was determined that Plaintiff had hyperkeratotic[4] plaques, mild tenderness and tense skin in his left ankle. He also had hyperkeratotic papules on his right ankle. Plaintiff was diagnosed with stasis dermatitis[5] with infection (Tr. 109).

On August 23, 2003, Plaintiff was diagnosed with chronic stasis dermatitis in his left ankle with acute infection (Tr. 108). Two days later, Dermatologist Resident Fasahat Hamzavi found Plaintiff had two erosions with yellow crust on his left medial distal lower extremity; he recommended that Plaintiff elevate his legs (Tr. 107-108). The Chief of the Dermatology Service, L. Boyd Savoy, concurred (Tr. 108).

---

[3]Cellulitis is a common, potentially serious bacterial skin infection that appears as a swollen, red area of skin that feels hot and tender. *See* http://www.mayoclinic.com/health/cellulitis/DS00450 (last visited May 21, 2013).

[4]Hyperkeratotic is the "overgrowth and thickening of the outer layer of the skin." *See* http://www.collinsdictionary.com/dictionary/english/hyperkeratotic (last visited May 21, 2013).

[5]"Stasis dermatitis can occur when fluid accumulates in the tissues just beneath the skin – typically on your lower legs – due to a sluggish return of blood from the leg veins back to the heart. The extra fluid interferes with your blood's ability to nourish your skin and places extra pressure against your skin from underneath." *See* http://www.mayoclinic/com/health/dermatitis-eczema/DS00339/DSECTION=causes (last visited May 21, 2013).

On September 15, 2003, Plaintiff complained of tenderness in his left lower leg. On examination, Plaintiff had two ulcers with yellow crust on his left medial distal lower extremity. Dr. Hamzavi recommended that Plaintiff elevate his legs, and Dr. Savoy concurred (Tr. 107).

On September 24, 2003, Plaintiff had cellulitis in his left leg (Tr. 105). Registered Nurse Barbara Bieke advised Plaintiff to elevate his left leg and modify his job (Tr. 100). Plaintiff was given compression stockings on September 30, 2003 (Tr. 119).

On October 1, 2003, Plaintiff visited the wound care clinic for follow up of his left medial ankle ulcer. The ulcer had decreased in size and was superficial. There was no cellulitis or purulent drainage. Plaintiff was given two pairs of compression stockings (Tr. 99).

Plaintiff visited the wound care clinic again on October 10, 2003. Plaintiff's ulcer was healed, and he was instructed to get new compression stockings in three months (Tr. 99).

Progress notes dated November 19, 2003, March 24, 2004, August 3, 2004 and January 4, 2005 indicate that Plaintiff had chronic venous stasis in his left leg, but his ulcer was healed; he did not have any significant occlusive disease;[6] his venous duplex was negative for deep vein thrombosis (DVT);[7] and there was no cellulitis. Plaintiff was advised to continue wearing his compression stockings  (Tr. 90-95, 97).

### 3.     Vocational Expert

---

[6]"Peripheral arterial occlusive disease is a type of atherosclerosis, a hardening and narrowing of the arteries that supply blood to the arms and legs. In most cases, it affects the legs. Problems result when blood flow to the extremities is severely reduced." See http://www.upstate.edu/surgery/healthcare/vascular/peripheral.php (last visited May 21, 2013).

[7]"Deep vein thrombosis (DVT) is a condition in which a blood clot (thrombus) forms in one or more of the deep veins in your body, usually in your legs. Deep vein thrombosis can cause leg pain, but often occurs without any symptoms." *See* http://www.mayoclinic.com/health/deep-vein-thrombosis/DS01005 (last visited May 21, 2013).

The ALJ asked a vocational expert ("VE") to assume a hypothetical individual of Plaintiff's age, education and work experience. The individual can perform light work, but can lift and carry no more than 20 pounds occasionally and 10 pounds frequently. He can stand and walk for six hours and sit for two hours with the ability to sit and stand at will. Additionally, the individual: (1) cannot push and pull with his left lower extremity; (2) can only occasionally climb ladders and steps, balance, stoop, kneel, crouch and crawl; (3) cannot be exposed to unprotected heights, chemicals, vibrating tools, moving machinery, dust, fumes or gases; and (4) is limited to simple tasks (Tr. 512). The VE testified that such an individual could perform Plaintiff's past work as a production assembler (Tr. 513).

When the VE reduced the hypothetical individual to sedentary work with the same limitations, the VE testified that the individual could not perform any of Plaintiff's past work (Tr. 513). But, the individual could perform work as a document preparer, information clerk, inspector, checker, sorter, bench hand assembler, surveillance systems monitor and security receptionist (Tr. 513-514).

Last, the VE testified that if the individual had to elevate his legs above his heart, he would be precluded from work at both the light and sedentary exertional levels (Tr. 514-515).

D.     *Plaintiff's Claim of Error*

Plaintiff argues that the ALJ erred by failing to find that he was disabled between October of 2003 and February of 2005 due to the need to elevate his legs. According to Plaintiff, while record evidence of the need to elevate his legs is sparse, Plaintiff was continuously diagnosed with chronic venous stasis throughout the relevant time frame – a condition that is best treated by leg elevation.[8]

---

[8]Plaintiff also argues that the ALJ erred by relying on his testimony at a previous hearing that he was involved in church activities, because he did not begin volunteering until after March

The ALJ considered Plaintiff's need to elevate his legs:

> Pursuant to dermatology progress notes dated August 25 and September 15, 2003, [Plaintiff] complained of pain and tenderness to his left lower leg. Examination revealed two ulcerations. Stasis dermatitis with stasis ulcer [] was diagnosed. Dicloxacillin and topical skin creams were prescribed. Resident Fasahat Hamzavi and Dermatology Services Chief L. Boyd Savoy advised [Plaintiff] to "elevate legs."
>
> First, I note that the medical credentials of dermatologists Hamzavi and Savoy are not apparent from the face of this record. I also considered the length, frequency, nature, and extent of the treatment relationship, the supportability and consistency of the physicians' conclusions, and especially the specialization of the physicians as required in this Circuit. That [Plaintiff] should "elevate legs" to an unspecified height for an unspecified length of time, is a restriction that is both vague and ambiguous. Given these factors, I give the foregoing opinion limited weight.
>
> \* \* \*
>
> As with the opinion of treating dermatologists Hamzavi and Savoy, above, the height to which [Plaintiff] was to elevate his legs, and the frequency with which this was to be done, is unclear from the treatment record. I thus ascribe minimal weight to such opinion.
>
> \* \* \*
>
> [Plaintiff] alleges disability during the entire period from October 31, 2003, through February 2005, secondary to his need to elevate his legs. The medical evidence refers to such restriction in August and September 2003. As discussed above, the opining dermatologists and wound care nurse were not specific as to the height and duration of leg elevation to which they referred. The [RFC] addresses [Plaintiff's] chronic venous stasis condition by allowing a sit/stand option so that swelling and other symptomatology when such condition flares up is not exacerbated.
>
> \* \* \*
>
> [a]lthough [Plaintiff] testified that he elevated his legs to above heart level all day, every day during the period at issue, there is no medical evidence contained

---

of 2005. It is unclear from the record when Plaintiff began volunteering; however, this is not germane to the conclusion that Plaintiff was not disabled during the relevant time frame. Based on the VE's testimony, the issue is whether Plaintiff's need to elevate his legs rendered him disabled.

-10-

>within this record to indicate that a treating physician ordered or recommended that he do so.

(Tr. 326, 329-330).[9] With regard to nontreating sources, the Sixth Circuit has instructed:

>[O]pinions from nontreating and nonexamining sources are never assessed for "controlling weight." The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6).

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). This Magistrate Judge finds that substantial evidence supports the ALJ's decision to afford "minimal" weight to the nontreating dermatologists' recommendation that Plaintiff needed to elevate his legs. First, the recommendation that Plaintiff elevate his legs was given in August and September of 2003 – before the time Plaintiff claims he was disabled.[10] Second, Plaintiff's two visits to the dermatologists while obtaining treatment from other sources, did not establish an examining relationship. *See Daniels v. Comm'r of Soc. Sec.*, 152 Fed.Appx. 485, 491 (6th Cir. 2005) (finding two visits to a doctor within "a few days is not a frequency consistent with the treatment of back pain, as evidenced by the fact that he received treatment from other sources on many occasions"). Third, Plaintiff's condition started improving in October of 2003 and compression stockings seemed to be sufficient to control his symptoms. Finally, the ALJ appropriately found

---

[9]This is in sharp contrast to the lack of analysis in the ALJ's previous decision dated January 14, 2008 regarding Plaintiff's need to elevate his legs (Tr. 12-19).

[10]Nurse Bieke's recommendation to elevate his left leg was also given before his alleged disability onset date.

that the leg elevation recommendations were not specific regarding how often Plaintiff needed to elevate his legs or how high they had to be elevated.[11]

## IV.     CONCLUSION

Because substantial evidence supports the ALJ's decision that Plaintiff was not disabled between October of 2003 and February of 2005, this Magistrate Judge **RECOMMENDS** that Plaintiff's motion for summary judgment be **DENIED**, Defendant's motion for summary judgment be **GRANTED**, and the Commissioner's findings be **AFFIRMED**.

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).  Failure to file specific objections constitutes a waiver of any further right of appeal.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation.  *See McClanahan v. Comm'r Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office.  *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this Magistrate Judge but this does not constitute filing.  *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response.  *See* E.D. Mich. LR 72.1(d)(3), (4).

s/Mark A. Randon

---

[11]Presumably, Plaintiff could elevate his legs to some degree consistent with his RFC for sedentary work.

-13-

                                      Mark A. Randon
                                      United States Magistrate Judge

Dated: May 22, 2013

### *Certificate of Service*

*I hereby certify that a copy of the foregoing document was mailed to the parties of record on this date, May 22, 2013, by electronic and/or ordinary mail.*

                                      *s/Eddrey Butts*
                                      *Case Manager for Magistrate Judge Mark A. Randon*